IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRIDGE OIL LTD. CAYMAN ISLANDS | § | |
| | § | |
| Plaintiff | § | |
| | § | C.A. NO. ________________ |
| VS. | § | ADMIRALTY |
| | § | Fed. R. Civ. Pro. 9 (h) |
| CHIAN SPIRIT MARITIME | § | |
| ENTERPRISES, INC. and , | § | |
| THALASSA MARITIME, INC. | § | |
| | § | |
| Defendants | § | |

**VERIFIED ORIGINAL COMPLAINT**

Plaintiff, Bridge Oil Ltd. Cayman Islands ("Bridge Oil"), by its attorneys, Chaffe McCall, L.L.P., and for its Verified Original Complaint against Defendants Chian Spirit Maritime Enterprises, Inc. ("Chian") and Thalassa Maritime, Inc. ("Thalassa"), and, upon information and belief, alleges as follows:

**JURISDICTION AND VENUE**

1. This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1333, and Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

**PARTIES**

2. At all material times, Plaintiff Bridge Oil was and still is a foreign corporation or other business entity with the capacity to sue and be sued.

3. At all material times, Defendant Chian was and is now a foreign business entity organized and existing pursuant to the laws of a foreign country with no duly appointed agent for

service of process located in this District. Defendant Chian is the owner, operator and/or manager of the M/V PANAMAX ANNA, a vessel presently located within the District at the Port of Galveston, Texas.

4. At all material times, Defendant Thalassa was and is now a foreign business entity organized and existing pursuant to the laws of a foreign country with no duly appointed agent for service of process located in this District. Defendant Thalassa is the registered owner of the M/V PANAMAX ANNA, a vessel presently located within in the District at the Port of Galveston, Texas.

**FACTS**

5. Upon the order of Defendant Chian, on its own account or as the agent for Thalassa, Plaintiff Bridge Oil supplied bunkers (fuel oil) to the M/V PANAMAX ANNA at the Port of Singapore on or about August 5, 2009. Please see email confirmation of the order from Bridge Oil to Chian, a copy of which is annexed as Exhibit A and is fully incorporated by reference. Additionally, please see Exhibits B1 and B2, which are copies of the Bunker Delivery Notes.

6. Pursuant to the confirmation stem (Exhibit A), the supply of bunkers to the PANAMAX ANNA was made pursuant to the terms and conditions of the physical supplier, Peninsula Petroleum, except as noted in the confirmation stem. A true and correct copy of the Peninsula Petroleum terms and conditions is attached as Exhibit C.

7. Plaintiff Bridge Oil issued its Invoice No. 24765 to the M/V PANAMAX ANNA and/or Master and/or owners and/or charterers and/or managers and/or operators and/or Chian for the delivery of bunkers to the PANAMAX ANNA in the amount of $361,045.00, which was due and payable no later than September 4, 2009. Please see a copy of the Invoice attached as Exhibit D.

8. The referenced Invoice No. 24765 remains past due and outstanding, notwithstanding several demands for payment by Plaintiff Bridge Oil, all in breach of the contract terms.

**RULE B ALLEGATIONS**

9. Plaintiff Bridge Oil is informed and believes that none of the officers of either Defendant Chian or Defendant Thalassa are now within the Southern District of Texas, that neither Chian nor Thalassa maintains an office within this District, that neither Chian nor Thalassa are incorporated or registered to do business in the State of Texas, that neither Chian nor Thalassa has an agent for the receipt of service of process in Texas, and that neither Chian nor Thalassa can be found within this District for purposes of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

10. Plaintiff Bridge Oil is informed and believes that Defendant Chian and/or Defendant Thalassa does now or will during the pendency of this action have certain goods and chattels, or credits and effects within the Southern District of Texas. Specifically, Plaintiff Bridge Oil is informed and believes that Defendant Chian and/or Defendant Thalassa is the owner of the M/V PANAMAX ANNA, and advances or other monies of any kind due and owing to Defendant Chian and/or Defendant Thalassa which may be in the hands of the Master of the M/V PANAMAX ANNA. Alternatively, Plaintiff asserts that Defendant Chian is the alter ego of Defendant Thalassa and that they may be treated as one and the same for purposes of the ownership of the PANAMAX ANNA and this litigation.

11 Plaintiff Bridge Oil agrees to hold harmless and indemnify the U.S. Marshal and all of his deputies from any and all liability as a result of attaching the aforesaid property aboard the M/V PANAMAX ANNA.

12. All conditions precedent have been satisfied and/or discharged.

13. All and singular of the premises are true and within the admiralty and maritime jurisdiction of the United States and of this Honorable Court.

WHEREFORE, Plaintiff, Bridge Oil Ltd. Cayman Islands, prays:

1. That process in due form of law, according to the practice of this Honorable Court in cases of admiralty and maritime jurisdiction, issue against Defendant Chian and Defendant Thalassa, citing them to appear and answer all and singular the matters aforesaid:

2. That process of maritime attachment and garnishment issue to attach and seize in the amount sued for Defendant Chian's and/or Defendant Thalassa's goods, chattels, credits and effects, including, but not limited to the M/V PANAMAX ANNA, and advances or other monies of any kind due and owing to Defendant Chian and/or Defendant Thalassa which may be in the hands of the Master of the M/V PANAMAX ANNA;

3. That as soon as is practical following the attachment and/or seizure of the Defendant Chian's and/or Defendant Thalassa's goods, chattels, credits and/or effects herein, a further hearing be held by this Court pursuant to Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure to hear any objections that Defendant Chian and/or Defendant Thalassa may have to the attachment and/or seizure;

4. That Plaintiff Bridge Oil may have judgment for its damages as aforesaid, together with interest, costs and attorney's fees, and that a decree of condemnation issue against the property of Defendant Chian and/or Defendant Thalassa for the amount of Plaintiff Bridge Oil's claim with interest, costs and attorney's fees; and

5. That Plaintiff Bridge Oil may have such other further and different relief as this Court deems just and proper.

Respectfully submitted,

/s/ Ivan M. Rodriguez

Kevin P. Walters
Texas State Bar No. 20818000
Federal I.D. No. 5649
Ivan M. Rodriguez
Texas State Bar No. 24058977
Federal I.D. No. 4566982
815 Walker Street, Suite 953
Houston, Texas 77002
Telephone: 713-546-9800
Facsimile: 713-546-9806

ATTORNEYS FOR PLAINTIFF,
BRIDGE OIL LTD. CAYMAN ISLANDS

OF COUNSEL:
CHAFFE McCALL, L.L.P.

# EXHIBIT A

**Julie Marquis**

**From:** Julie Marquis
**Sent:** 30 July 2009 14:27
**To:** 'operations@chianspirit.gr'
**Subject:** Order - Panamax Anna

To: Chian Spirit Maritime Enterprises Inc
Attn: Capt Bourdis

Date: 30/07/09

On behalf of Bridge Oil Ltd, Cayman Islands, we are pleased to have placed the following order:

| | |
|---|---|
| Order Ref | : JUM/JUM - 105135 |
| Buyer | : MOTOR VESSEL Panamax Anna and/or master / |
| | : owners / charterers / |
| | : managers / operators and/or |
| | : Chian Spirit Maritime Enterprises Inc |
| | : 126 Kolokotroni Street |
| Seller | : Bridge Oil Ltd., Cayman Islands |
| Vessel | : Panamax Anna |
| IMO No. | : 8202678 |
| Port | : Singapore |
| Delivery Date | : 03/08/09 - 04/08/09 |
| ETA | : 03/08/09 |
| ETS | : 04/08/09 |
| Agent | : Hellenic Overseas Maritime (Tel/Fax) 0065-64647318 / 64647348 / 0065-64647319 E-mail: hellenseas@pacific.net.sg |
| Quantity/Grade | : 850 Mts. Fo-380 Cst. rmg380 |
| Price | : USD 404.00 / MTS |
| Quantity/Grade | : 50-70 Mts. Gas-Oil DMA ex pour point |
| Price | : USD 549.00 / MTS |

OTHER COSTS relating to the delivery if applied, i.e. wharfage, anchorage, demurrage, overtime, etc., for buyer's account.
Please be advised that in case of cancellation, either partially or fully, any cancellation costs incurred are for buyer's account.

| | |
|---|---|
| Remarks | : basis no dnv maritec and viswa SS600 2008 to apply Physical Transocean |
| Terms of payment | : In full within max 30 days from date of delivery by telegraphic transfer against our fax or e-mail invoice. |

Interest shall be payable by the buyer at 1.5 percent per month or pro-rata for any part thereof in respect of late payment.
Buyer agrees to reimburse seller in full for all costs and expenses incurred by seller arising out of and/or in connection with non or late payment.

**Notes:**

It is masters/ce's responsibility to ensure when signing delivery note and acknowledgement of sealed samples - that samples have actually been received on board.

Supplier's terms and conditions to apply and available upon request to and be incorporated in the contract save that:

1. Title to the product/s the subject of this contract shall remain with the seller until the seller has been paid in full and the seller shall have a lien on the vessel and on any bunkers/lubricants on board her in respect of his claim for payment for the product/s the subject hereof to include interest thereon and legal and any other ancillary costs.

2. Risk in the product/s supplied shall pass to the purchaser as the product/s pass/es the flange on entry to the vessel's lines.

3. If any dispute arises out of or in connection with this contract it shall, at seller's option, be determined before the high court in England and in accordance with English Law. Any claims following the supply must be made within 7 days of delivery.

We thank you for this business.

Thanks & best regards,
Julie Marquis
Mobile number

Bridge Oil (UK) Ltd.
Telephone: +44 20 7799 4420
Fax: +44 20 7799 4421
E-mail: comm@kpi-bridgeoil.co.uk

# EXHIBIT B1





3791 Jalan Bukit Merah E-Centre @ Redhill #09-26 Singapore 159471 Tel: 65-6377 1777 Fax: 65-6377 1737

BDN NO. 13724

(LICENCE NO: 03258)

**BUNKER DELIVERY NOTE**

| | | | |
|---|---|---|---|
| Port | : SINGAPORE | Date | : 05-08-09 |
| Delivery Location | : AEBA | Vessel's Name | : PANAMAX ANNA |
| Bunker Tanker's Name | : BLISS | IMO No. | : 8202678 |
| SB No. | : 636 I | Gross Tonnage | : 37184 |
| Alongside Vessel | : 05-08-09 0130 (Date/Time) | Owner/Operator | : MASTER |
| Commenced Pumping | : —"— 0245 (Date/Time) | ETD | : 05-08-09 AM |
| Completed Pumping | : —"— 0505 (Date/Time) | Next Port | : SPAIN |

**PRODUCT SUPPLIED**

| Fuel Characteristics | | Quantity | |
|---|---|---|---|
| Product Name | MFO 380 | Gross Observed Vol (Litres) | 822924 |
| Viscosity @40°C or 50°C, $mm^2/s$ (ISO 3104) | 369 | Gross StandardVol (Litres) | 813378 |
| Density @15°C, $kg/m^3$ (ISO 3675 or ISO 12185) | 0.9908 | Quantity (Metric Tons) | 805.000 |
| Water Content % V/V (ISO 3733) | TRACE | Barrels at 60°C | N.A |
| Flash Point°C (ISO 2719) | 83 | Volume Correction Factor (ASTM Table 54B) | 0.9884 |
| Sulphur Content, % m/m (ISO 14596 or ISO 8754) | 2.88 | Weight Conversion Factor (ASTM Table 56) | 0.9897 |

**SUPPLIER'S CONFIRMATION**

We declare that the fuel characteristics and quantity of the product supplied are correct. We certify that the bunker fuel oil delivered meets the requirements of regulations 14 and 18 of Annex VI of MARPOL 73/78.

For AS ABOVE
Company's Name and Stamp

[signature]
Signature of Cargo Officer

L.H.Kim
Full Name in Block Letters

[stamp: SINGAPORE * M.T. BLISS * MASTER]
Bunker Tanker's Stamp

**MASTER'S/CHIEF ENGINEER'S ACKNOWLEDGEMENT**

We acknowledgement receipt of the above product and confirm that samples were taken at the vessel's manifold, sealed and numbered as follows:

| | Seal no: | Counter Seal no: (if any) |
|---|---|---|
| Vessel : | 050721 | 150361 |
| Marpol : | 050722 | 150362 |
| Bunker Tanker : | 050723 | 150363 |
| Surveyor : | 050724 | 150365 |
| Others : | (To specify) | (To specify) |

Acknowledgement by:

[signature]
Signature of Master / Chief Engineer / Time

OMER FLORES
Full Name in Block Letters

Vessel's Stamp [stamp: M.V. PANAMAX ANNA * VALLETTA *]

CUSTOMER RATING OF SATISFACTION LEVEL 1 Very Unsatisfied 2 3 4 (5) Very satisfied

Was a Note of Protest Issued? ~~Yes~~ No

REMARKS: NIL.

# EXHIBIT B2







3791 Jalan Bukit Merah E-Centre @ Redhill #09-26 Singapore 159471 Tel : 65-6377 1777 Fax : 65- 6377 1737

(LICENCE NO: 03258) BDN NO. 15253

**BUNKER DELIVERY NOTE**

| | | | |
|---|---|---|---|
| Port | : SINGAPORE | Date | : 040809 |
| Delivery Location | : AEBA | Vessel's Name | : PANAMAX ANNA |
| Bunker Tanker's Name | : ARSENAL | IMO No. | : 8202678 |
| SB No. | : 404H | Gross Tonnage | : 37184 |
| Alongside Vessel | : 040809 / 2000HRS (Date/Time) | Owner/Operator | : MASTER / OWNER |
| Commenced Pumping | : 040809 / 2230HRS (Date/Time) | ETD | : 050809 |
| Completed Pumping | : 040809 / 2330HRS (Date/Time) | Next Port | : SPAIN |

**PRODUCT SUPPLIED**

| Fuel Characteristics | | Quantity | |
|---|---|---|---|
| Product Name | MGO | Gross Observed Vol (Litres) | 75924 |
| Viscosity @40°C or 50°C, $mm^2/s$ (ISO 3104) | 4.5 | Gross StandardVol (Litres) | 75127 |
| Density @15°C, $kg/m^3$ (ISO 3675 or ISO 12185) | 0.8697 | Quantity (Metric Tons) | 65.255 |
| Water Content % V/V (ISO 3733) | TRACE | Barrels at 60°F | N.A |
| Flash Point°C (ISO 2719) | 78 | Volume Correction Factor (ASTM Table 54B) | 0.9895 |
| Sulphur Content, % m/m (ISO 14596 or ISO 8754) | 0.4 | Weight Conversion Factor (ASTM Table 56) | 0.8686 |

**SUPPLIER'S CONFIRMATION**

We declare that the bunker fuel supplied conforms with Regulations 14(1) or (4) (a) and Regulation 18(1) of MARPOL 73/78 Annex VI.

For AS ABOVE
Company's Name and Stamp

[signature]
Signature of Cargo Officer

TAN SPENCER
Full Name in Block Letters

ARSENAL SB 404H
Bunker Tanker's Stamp

**MASTER'S/CHIEF ENGINEER'S ACKNOWLEDGEMENT**

We acknowledgement receipt of the above product and confirm that the following samples were jointly taken by continuous drip sampler at the vessel's manifold, sealed and numbered:

| | Seal no: | Counter Seal no: (If any) |
|---|---|---|
| Vessel : | 047391 | 150356 |
| : | 047392 (MARPOL) | 150357 |
| Bunker Tanker : | 047393 | 150358 |
| Surveyor : | 047394 | 150360 |
| Others (To specify) : | | |

Acknowledgement by: [signature]
Signature of Master / Chief Engineer / Time

FLORES EMIEL
Full Name in Block Letters

M/V PANAMAX ANNA VALLETTA
Vessel's Stamp

CUSTOMER RATING OF SATISFACTION LEVEL 1 Very Unsatisfied 2 3 4 5 Very satisfied (5 circled)

Was a Note of Protest Issued? Yes No (No circled)

REMARKS :

# EXHIBIT C

# MARINE FUELS




## *Terms and conditions of sale - February 2009*

1. **Definitions**
Throughout these Terms & Conditions of Sale, save where the context requires, the following definitions shall be applied:
"Marine Fuels" means products, derived from crude oil, delivered or to be delivered by the Seller.
"Seller" means Peninsula Petroleum Limited, and
"Buyer" means the party contracting to purchase, take delivery of and pay for the Marine Fuels.

2. **Application of Terms and Conditions of Sale**
These terms and conditions shall apply to all deliveries contracted for unless the Seller expressly agrees otherwise in writing. Each delivery shall be a separate contract and the Buyer shall be deemed to have read and accepted the terms and conditions contained herein.

3. **Price**
(a) Unless otherwise stated in the Seller's quotation, the Seller's prices are for delivery ex-wharf in bond and exclude taxes, duties, wharfage dues, delivery and any other charges leviable in respect of Marine Fuels for the time of delivery. Any such taxes, duties, wharfage dues, delivery charges and other charges shall be paid by the Buyer at the rate applicable for the actual date of delivery.
(b) In the event that the price is quoted in Volume units, conversion to standard volume shall be at 60 degrees Fahrenheit or 15 degrees Celsius
(c) Prices quoted as "delivered" comprise the ex-wharf price and delivery charges only.
(d) Prices will be valid for delivery within 7 days of concluding the Contract and the Buyer take delivery within the said 7 days.
(e) If after the contract is concluded, the Buyer begins to take delivery, or requires delivery to begin, outside the 7 day range referred to in sub-section (d), the Seller shall be entitled to amend its quoted price to take account of prevailing market prices. This right is without prejudice to any claim the Seller may have against the Buyer for damages for failing to take delivery within the 7 day period

4. **Grades**
(a) The Marine Fuels supplied hereunder shall be the Seller's commercial grades offered to customers at generally the time and delivery location from time to time. The Buyer shall be solely responsible for nominating to the Seller the grade of Marine Fuels for each delivery from the range of fuels supplied by the Seller at the location in question.
(b) Information regarding the typical characteristics of the Marine Fuels at any delivery location shall only be indicative of the Marine Fuels that have been available at that location from time to time and shall not form part of the specification of Marine Fuels to be delivered.
(c) All other warranties and all conditions relating to quality, fitness for purpose, description or otherwise, whether expressed or implied by common law, statute, or otherwise are hereby excluded.
(d) The Buyer hereby warrants that it has not relied upon any representations made by or on behalf of the Seller but has relied exclusively on its own knowledge and judgment as to the fitness for its purpose of the Marine Fuels ordered.
(e) The Seller expressly reserves the right to supply Marine Fuels blended by the Seller at any time prior to delivery provided always that the Marine Fuels delivered are in accordance with the grades and specifications contracted for by the Buyer.

5. **Notice to Port**
The Buyers, or their agents at the port or place of delivery, shall give the Sellers', or their representatives at the port or place of delivery, 72 and 48 hours approximate and 24 hours definite written notice of arrival, also advising any change in excess of three (3) hours, and the exact location and time at which deliveries are required.

6. **Reception**
(a) The Buyer shall be responsible for providing safe reception of the full quantity of Marine Fuels contracted for without risk to the Buyer; the Seller, any agent, employee or supplier of the Buyer or Seller or to the property of any such parties (negligence by the Seller or failure of or defect in the Seller's equipment being solely excepted). The Buyer shall ensure that the vessel to be supplied with Marine Fuels shall be free from all conditions or defects which might give rise to any hazard in connection with the delivery of Marine Fuels to such vessel. The Buyer shall ensure that the vessel has sufficient tankage and equipment to receive the Marine Fuels promptly and safely and shall be responsible to make all connections and disconnections between the delivery hose(s) and the vessels intake pipe and ensure the hose(s) are properly secured to the Vessels manifold prior to commencement of delivery.
(b) The Buyer shall provide a free side for barge deliveries and prompt and safe passage between the public roadway and the actual place of unloading for road vehicles. The Seller shall not be obliged to deliver in locations or over roadways which in its opinion are unsafe for its barges or vehicles.
(c) If a spill occurs during supply the Buyer shall promptly take all action reasonably necessary to remove the spillage and mitigate its effect. If the Buyer fails to promptly take such action, the Seller may, at its option and upon notice to the Buyer or the agent for the Buyer's vessel take such measures it considers to be required in connection with the removal of the spillage and the mitigation of its effects by employing its own resources or contracting with others. The Buyer shall indemnify the Seller against all liability, costs and expenses (including but not limited t those incurred by the Seller in accordance with the provisions of this sub-clause (c)) arising from any spillage except to the extent that such spillage has been caused or contributed to by the negligence of the Seller or failure of or defect in the Seller's equipment. The Buyer shall promptly provide the Seller with any requested documents and information regarding a spill including the vessel's spill contingency plan or any other applicable program for the prevention or mitigation of pollution as required by any applicable laws or regulations.
(d) If the Buyer fails to take delivery of or rejects any amount of the Marine Fuels contracted for, the Buyer shall be liable for all expenses and loss incurred by the Seller and arising out of such failure or rejection by the Buyer.

7. **Delivery**
(a) If delivery is to be made by barge or road vehicle the Buyer shall notify the Seller when making its enquiry. The Seller undertakes to provide such delivery only within normal harbour limits. If the Buyer or its representative requests delivery by barge or road vehicle after conclusion of the contract such delivery shall be subject to the reasonable availability of the necessary facilities and payment by the Buyer of any additional costs.
(b) Where the Buyer or its representative requests a time of delivery, the Seller's obligation shall be to deliver as soon thereafter as reasonably practicable having regard to congestion affecting the delivery facilities of the Seller, its suppliers or agents and to prior commitments of barges and vehicles. The Buyer shall not be entitled to demurrage or other compensation for delay unless expressly agreed and confirmed by the Seller in writing.
(c) The Seller shall not be liable for inability to deliver on public or dock holidays or on customary non--business days of the week.
(d) The Buyer shall pay the Seller for delivery services at the rates applicable on the date of delivery and for all additional charges incurred in connection with the delivery, including but not limited to, port dues, wharfage, demurrage, provision of additional hose in excess of that normally available and the use of all oil pollution control equipment required to effect delivery. Where work is carried out in connection with deliveries outside normal working hours at the port or outside normal harbour limits the Buyer shall be liable for all additional charges.
(e) Unless otherwise specifically agreed, the Seller shall be under no obligation to supply the Vessel immediately on its arrival in Port.
(f) In the event of the Buyer's Vessel through no fault of the Seller not being available to accept delivery of the Marine Fuels at the time and date agreed between the parties, the Seller shall incur no liability whatsoever for any subsequent delay in delivery of the Marine Fuels.

8. **Quality, Quantity and Sampling**
(a) The Seller shall measure quantity and take samples of the Marine Fuels delivered. The Seller shall take three samples in accordance with its normal sampling procedures at the port in question. Two samples shall be retained by the Seller and one sample shall be passed to the Buyer (or its representative) for its retention. The Buyer (or its representative) may witness such measurement and sampling. The measurements of volume and calculations of quantity quantity taken by the Seller shall be conclusive of the volume and quantity of Marine Fuels delivered. The results of the analysis of the Seller's samples shall be conclusive of the quality of the Marine Fuels delivered.
(b) The aforementioned samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date, and place and seal number, authenticated with the Vessel's stamp and signed by the Sellers' representative and the Master of the Vessel or his authorized representative. Two samples shall be retained by the Sellers for sixty days after delivery of the Marine Fuels to the Vessel and the other sample shall be retained by the Vessel.
(c) The Buyer shall not be entitled to complain of an incorrect measurement of the volume of Marine Fuels delivered unless the Buyer or its representative has witnessed such measurement and has made a complaint in writing at the time of delivery. Any claim as to short delivery shall be presented by the Buyers in writing within 15 days from the date of delivery including full supporting documentation and providing Suppliers were notified in writing at the time of delivery, failing which any such claim shall be deemed to be waived and absolutely barred.
(d) The Seller shall not entertain any claim for any defects in the quality of Marine Fuels unless the Seller receives notice in writing of a complaint within 15 days of delivery and receives full details of the claim with supporting evidence. Failing this any such claim shall be deemed to be waived and absolutely barred. In the event of a dispute regarding the quality of Marine Fuels the parties hereto shall have the quality of the Marine Fuels analysed, by a mutually agreed, qualified and independent laboratory under witness on one of the samples retained by the supplier as detailed in clause 8(a). The results of testing this sample shall be final and binding on both Parties.

# MARINE FUELS




## *Terms and conditions of sale - February 2009* Cont.

9. **Risk and Property**
   (a) Risk in the Marine Fuels shall pass to the Buyer once the Marine Fuels have passed the flange connecting the Seller's bunker manifold with the vessel being supplied with Marine Fuels. Title to the Marine Fuels shall pass to the Buyers upon payment for the value of the Marine Fuels delivered, pursuant to the terms of Clause 14 hereof. Until such payment has been made, the Sellers shall have a right of lien over the Marine Fuels delivered. In the event that the marine Fuels have been commingled with other bunkers on board the vessel supplied, the Sellers shall have the right of lien to such part of the commingled bunkers as corresponds to the quantity of the Marine Fuels delivered.
   (b) "No-Lien" stamps or the use of any wording similar in nature and/or meaning on any document including but not limited to bunker delivery receipt(s) whether used by the Buyer or any third party shall be invalid and have no legal effect, and shall in no way prejudice any right of lien the Seller may have against the Buyer over the Marine Fuels.

10. **Health, Safety and the Environment**
   (a) The Buyer shall ensure that its employees comply fully with all requirements, obligations and recommendations relating to the handling and use of the Marine Fuels delivered hereunder and shall impose upon all of its customers to whom the Marine Fuels are to be supplied the same obligation to comply fully with the requirement, obligations and recommendations.
   (b) The Seller shall not be responsible in any respect whatsoever for any loss, damage or injury resulting from any hazards inherent in the nature of any Marine Fuels.
   (c) The Buyer shall at all times comply with any obligations, requirements or recommendations contained in any law, statute directive or regulation of any territory, state or jurisdiction in or through which the Marine Fuels may be delivered, sold, transported or used and all Government, state or local regulations at the port such as but not limited to, those related to fire, or spillage or loss of Marine Fuels. Compliance by the Buyer with the recommendations referred to in sub-section (a) shall not excuse the Buyer from its obligations under this sub-section (c).
   (d) The Buyer shall indemnify and keep indemnified the Seller against any liability, claim or proceedings whatsoever arising out of or in connection with any failure by the Buyer to comply with its obligations under this Section.

11. **Seller's and Buyer's Liabilities and Consequential Loss**
   (a) The liability for breach of any condition or conditions whatsoever shall be limited to the payment of damages.
   (b) The Buyers shall indemnify the Seller and save it harmless in respect of any losses inclusive of interests and costs arising from any delay resulting from the Buyers' failure to give proper notices and/or to comply with clause 5 and/or the Buyers Vessel failing to receive Marine Fuels at less than 300 mts per hour.
   (c) The Buyers shall not assign the contract or any of its rights and obligations under it without the express consent in writing of the Seller.
   (d) Any addition to or deletion from the Bunker Receipt made by the Buyer or its representative and/or any documents presented by the Buyer or its representative at the time and place of delivery which purport to alter the terms of the contract shall have no validity.
   (e) The Seller shall not have any liability, howsoever arising and whether as a result of a breach of the contract, negligence or otherwise, for any loss of profit, or anticipated profit, loss of time or hire, cost of overheads thrown away, demurrage or loss of schedule, cost of substitute vessel(s), loss related to loss of operational use of vessel, physical loss or damage to cargo, or loss of contract(s), in each instance whether such losses are direct, consequential or otherwise nor, without prejudice to the foregoing, shall the Seller be liable for any consequential, indirect or special losses or special damages suffered by the Buyer.
   (f) The exclusions of liability set out in the contract shall only apply to the extent permitted by law and shall not apply in respect of fraud by the party seeking to rely on the exclusion.

12. **Agency**
   If the delivery is contracted for by the Buyer as an agent of any other person or by any person as an agent of the Buyer, whether such agency is disclosed or not, such agents and principals shall be jointly and severally liable with the Buyer for all obligations expressed to be those of the Buyer under the contract and for the due and proper performance of the contract.

13. **Force Majeur**
   Neither party shall be responsible for any loss, damage, delay or failure in performance under the contract resulting from act of God, or the port of delivery being affected by war, civil commotion, riot, quarantine, strikes, stoppages, lock-outs, arrests, restraints or detainments of Kings, Princes, Rulers and the People or any other event whatsoever arising after conclusion of the contract which cannot be avoided or guarded against by the exercise of due diligence, or the consequences of which, as may affect the performance of the contract cannot be avoided or guarded against by the exercise of due diligence.

14. **Payment Terms**
   (a) Payment for the delivery and of all other charges shall be made in full (without any abatement, deduction, set-off or counter claim whatsoever) in US dollars. Payment shall be due with effect from the date of delivery and shall be made by means of Telegraphic transfer, automated credit transfer or electronic transfer of same day funds quoting the Seller's invoice number and the Buyer's name value shall be dated no later than 30 days (or such other period as is agreed by the parties) from commencement of loading of the delivery in question. If, however, the Seller's bank is closed for business on the last day of the applicable credit period the Buyer shall make its payment by the last day within such credit period when the Seller's bank is open for business. All bank charges in respect of such payments shall be for the remitter's account.
   (b) The Buyer shall notify (or shall instruct its bank to notify) the Seller as soon as payment has been made quoting the date on which payment was made, the amount, the name of the bank effecting payment and details of each invoice to which the payment relates. Such notification shall be sent to
   (c) If the Buyer has not by the expiration of the credit period referred to in sub-section (a) paid any amount due to the Seller in respect of any other delivery of Marine Fuels by the Seller to the Buyer the Seller, in addition to and without prejudice to any other rights it may have shall have the right:
      (i) if the delivery hereunder has been made, notwithstanding the credit period referred to above, to notify the Buyer that the amount due in respect of the delivery hereunder is immediately due and payable a whereupon it shall so be paid; and
      (ii) if the delivery hereunder has not been made to notify the Buyer of the termination with immediate effect it the contract for such delivery whereupon it shall so terminate.
   (d) If the Buyer' credit is deemed by the Seller to be impaired or unsatisfactory, the Seller may (without prejudice to its other rights) require the Buyer at the Seller's option either to pay cash before delivery or to provide security satisfactory to the Seller and to effect immediate payment of any outstanding amount due to the Seller in respect of any other delivery of Marine Fuels by the Seller to the Buyer. In the event of failure by the Buyer to comply with the Seller's requirement the Seller shall have no obligation to make delivery and may terminate the contract on giving notice to that effect to the Buyer.

   (e) Without limitation to the foregoing or to the Seller's other rights under the contract or otherwise the Seller shall have the right to require, in respect of any payment not made by the due date, the payment by the Buyer to the Seller of interest thereon at 2 per cent per thirty day period, and pro rata for part thereof, such interest to run from the due date until the date payment is received by the Seller's bank.

15. **Termination**
   Without prejudice to accrued rights hereunder, the Seller shall be entitled to terminate this Contract in the event of :
   (a) any application being made or any proceedings being commenced, or any order or judgment being given by any court, for
      (i) the liquidation, winding up, bankruptcy, insolvency, dissolution, administration or re-organisation, or similar, or
      (ii) the appointment of a receiver, liquidator, trustee, administrator, administrative receiver or similar functionary of the other party or all or a substantial part of its assets otherwise than for the purpose of a reconstruction or amalgamation):
   (b) the Buyer suspending payment, ceasing to carry on business or compounding or making any special arrangement with its creditors:
   (c) any act being done or event occurring which, under the applicable law hereof, has a substantially similar effect to any of the said acts or events described above.

16. **Waiver, Amendments and Severability**
   (a) No waiver by either party of any provision of the contract shall be binding unless made expressly and expressly confirmed in writing. Any such waiver shall relate only to such matter, non-compliance or breach as it expressly relates to and shall not apply to any subsequent or other matter, non-compliance or breach.
   (b) No amendment to any provision of the contract shall be binding unless expressly confirmed in writing by the Seller.
   (c) If any provision of the contract is invalid, void or unenforceable, this will not affect the validity, legality or enforceability of any other provision of the contract.

17. **Non-physical supply**
   (a) These Terms and Conditions are subject to variation in circumstances where the physical supply of the Marine Fuels is being undertaken by a third party("the Third party"). In such circumstances these terms and conditions shall be varied accordingly and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the Third Party ("The Third Party Terms").

# MARINE FUELS







(b) Without prejudice to the generality of the foregoing, in the event that the Third Party Terms include:

(i) shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated to these Terms and Conditions.

(ii) any additional Exclusion of Liability clause then such clause shall be incorporated mutatis mutandi to these Terms and Conditions.

(c) It is hereby acknowledged and expressly agreed that the Buyer shall not have any rights against the Supplier greater or more extensive than the rights of the Supplier against the Third Party.

**18. Notice**

Any communication (including without limitation invoices) by either party to the other shall, unless otherwise provided herein, be sufficiently made if sent by post (by airmail where airmail is possible), postage paid or by telex or facsimile transmission to the address of the other party and shall, unless otherwise provided herein, be deemed to have been given on the day on which such communications ought to have been delivered in due course of postal, telex or facsimile communication.

**19. Arbitration and Governing Law**

This Contract shall be governed by and construed in accordance with English law and any dispute arising out of this Contract shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator; one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-men tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within 14 days, failing which the decision of the single arbitrator appointed shall be final.

For disputes where the total amount claimed by either party does not exceed the amount of US$50,000, the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

**20. Rights of Third Parties**

Except for the provisions of sub-sections 3(d) and 10(d) of the contract which may be enforced by the Seller, its Affiliates and its and their directors, employees and agents, the parties do not intend any term of the contract to be a enforceable under the Contracts (Rights of Third Parties) Act 1999 by any person (a "third party") who is not a party to the contract. The parties may rescind or vary the contract, in whole or in part, without the consent of any third party including, without limitation, those listed above. "Affiliate" means any company that directly or indirectly controls, is controlled by or is under common control with the Seller; for this purpose one company controls another if it holds more than 50% of the voting rights in the other.

# EXHIBIT D

**Order 105135**



# BRIDGE OIL LTD

Boundary Hall, Cricket Square, P.O. Box 1111, Grand Cayman KY1-1102, Cayman Islands B.W.I

## INVOICE

M/V Panamax Anna and/or master and/or
owners and/or charterers and/or
managers and/or operators and/or
Chian Spirit Maritime Enterprises Inc
126 Kolokotroni Street
Piraeus, 185 36
GREECE

Invoice Date: 07/08/09
Invoice No.: 24765
Our Order No.: 105135
Our Reference: JUM/JEC

**Vessel Name:** Panamax Anna
**Delivery Date:** 05/08/09
**Port:** Singapore

| Product/Quality | Quantity | Unit Price USD | Amount USD |
|---|---|---|---|
| Fo-380 Cst. rmg380 | 805.0000 Mts. | 404.00 | 325,220.00 |
| Gas-Oil DMA ex pour point | 65.2550 Mts. | 549.00 | 35,825.00 |

**Total Amount Due** **361,045.00**
**Due Date** **04/09/09**

Payable by telegraphic transfer in USD in full to:
DANSKE BANK
2-12, Holmens Kanal
DK-1092 Copenhagen K
DENMARK
SWIFT: DABADKKK

In favour of: Bridge Oil Ltd.

Account No.: 3205928367
IBAN No.: DK1630003205928367

Reference: Invoice Number and Order Number

**ALL BANK CHARGES ARE FOR THE REMITTER'S ACCOUNT**

Please Note: Interest will be charged to the buyer at 1.5% per month or pro-rata for any part thereof in respect of late payment after due date.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRIDGE OIL LTD. CAYMAN ISLANDS | § | |
| | § | |
| Plaintiff | § | |
| | § | C.A. NO. _______________ |
| VS. | § | ADMIRALTY |
| | § | Fed. R. Civ. Pro. 9 (h) |
| CHIAN SPIRIT MARITIME ENTERPRISES, INC. and , THALASSA MARITIME, INC. | § § § | |
| | § | |
| Defendants | § | |

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

**VERIFICATION**

BEFORE ME, the undersigned notary, personally came and appeared:

IVAN M. RODRIGUEZ

who, after being duly sworn, did depose and say the following:

(1) That he is a member of the law firm of Chaffe McCall L.L.P., who have been retained to represent Plaintiff, Bridge Oil Ltd. Cayman Islands, in connection with the above-captioned matter;

(2) That he has read the foregoing Verified Original Complaint and believes it to be true and accurate to the best of his knowledge and belief;

(3) That his knowledge and belief are based upon facts supplied by Bridge Oil Ltd. Cayman Islands and his review of documentation provided by Bridge Oil Ltd. Cayman Islands;

(4) That he has consulted or has had consulted the Texas Secretary of State's office as well as the local telephone directories and trade publications and has been unable to locate an agent for

service of process for Defendant Chian Spirit Maritime Enterprises, Inc. or Defendant Thalassa Maritime, Inc.;

(5) That he makes this Verification on behalf of Bridge Oil Ltd. Cayman Islands because Bridge Oil Ltd. Cayman Islands is a foreign person having no local representative.

Ivan M. Rodriguez

SUBSCRIBED AND SWORN to before me on October 1, 2009.




Notary Public, State of Texas